Mr. Wallace. Your Honor, may it please the Court, I am Mike Wallace of Mississippi, representing eight present and former members of the Mississippi Legislature who have been served with coercive civil process in the form of subpoena du castigo. They ask this Court to protect them under the doctrine of legislative privilege. That's an important issue, as indicated by the fact that Texas and Louisiana have filed on our side and the Justice Department has filed on the other. But before you can get to that issue, you have to get through questions of this Court's jurisdiction and the District Court's jurisdiction. I think this Court's jurisdiction should be clear for multiple reasons. All parties agree that jurisdiction exists if the Magistrate's order compelled my clients to disclose evidence. The panel correctly concluded that the District Court order ordered us to produce communications with third parties. That's the right reading. We have submitted you Judge Ball's recent order in another case where he describes this order and he says that's exactly what he did. He said there was no privilege and we were supposed to produce it. That is jurisdiction here. It's also jurisdiction because the order quotes Local Rule 26, which requires us to name the recipients of communications. Names are evidence, as this Court knows from the latest appeal in the La Union case, in which they want to find those recipients and get them released. The point is the recipients are clearly evidence and before we name names, we're entitled to come here to ask for relief. I would go further because the privilege protects legislators against burden as well as disclosure. I would say any time the Court orders the legislators to get busy and do something, they've got a right to come here and ask for your approval before they do it. But you don't need to reach any of those issues. We believe that jurisdiction has long since been established by the law of the case. This was fairly and fully argued in the Stallworth appeal and it was resolved in favor of the Court's jurisdiction. In-bank courts can do a lot of things. But I don't think you can disregard res judicata and I don't think you have to disregard law of the case. You certainly have discretion to rely on that jurisdiction, which you've been exercising for five or six years now, and we think you ought to get on with the real issues. Mr. Wallace, thank you for waiving your uninterrupted time. You know where I'm coming from because you've already read my dissent in the case and I don't think there's standing for the commissioners here. So this case has been around quite a long time. It's been before two panels of our court, now before the en-bank court. It's got many parties and many complexities. So my question to you is if, and there's a big if, if the en-bank court agreed with me on standing, what else would there be left in this case? Would there be anything else left in the case beyond the claims that would necessarily then have to be dismissed for lack of standing? As you know, I don't represent the defendants and a lot was done before I got in here. But if these plaintiffs have no federal standing, then their claims, which are count seven and eight, would be dismissed. The court has already dismissed most of the claims of the city of Jackson. Individual city council members have a state law due process claim that's pending, and then a bunch of people in count five have a state law claim on general law versus specific law. I would think that Judge Reeves would, because that's supplemental jurisdiction, if all the federal cases are gone, I would think he would dismiss that and let it go to federal court. I'm not telling you you have to order that, but I think it would be an abuse of discretion to go forward with those state cases if there's nothing left for the federal court. That's certainly an argument you could make. Okay, thank you. Isn't there also a mootness issue here, Mr. Wallace? That is, none of the seven members are anymore on the board. So how is this anything but separate from standing? Your Honor, I think that is finally clear that the actual parties no longer have any claims. So they lack jurisdiction for two reasons. The first one is they never had standing to begin with, and the second reason is if they ever did, they don't anymore, because they're out of their jobs and they're out of the case. Supreme Court held last month that you can take those in whichever order you want. Given this case has been going on for eight years, I would strongly encourage you to look first at the question of whether there's ever been any standing to begin with, because if this is the case, you're going to be back here again in the 10th and 11th years of this case trying to figure out if they've found somebody with standing yet. But there's no jurisdiction for both of those reasons. I hope you'll touch standing, which is what I would like to turn to now, if I could. Spring Court in Lujan quoted by the- But you're agreeing with mootness? Excuse me? You're agreeing that it is moot as to your people? It is as moot as it can be. Now, the only way that . . . Why are we sitting here? I've been asking myself that for years. Part of it is they've never admitted until their in-bank brief that all of their people are gone. They are now gone. They change names in City Hall quite often, but every party, every individual party to this case is now admitted. They say it keeps going on the doctrine of capable of repetition and yet evading review. They're on their third set of commissioners. I suppose it's capable of repetition, but they cite this court's Coliseum Square case, and the capable of repetition standard is that the complaining plaintiff has a reasonable expectation of being subject to the same action. They don't even pretend that the plaintiffs in this case are subject to being subject to the same action. They've left the board. The only injunction they asked for was that nobody remove them from the board. Well, they removed themselves. Coliseum Square, capable of repetition, doesn't apply. It is moot, moot, moot. If that's the way you want to decide the case, you have discretion to do so, as the Supreme Court held last month. Is your mootness argument—pardon my ignorance, because I think I may have missed something about this case—premised on your standing argument, or do you have an independent mootness argument? Okay, if it's premised on standing, I just want to understand it. I only have one mootness argument, which is the plaintiffs in the case admit they no longer work there. I mean, I think that's moot, regardless of what the standing argument is. If, hypothetically, the benefits, the per diem and travel and whatnot, if, hypothetically, that's enough for standing, is it still moot? It's still moot because they haven't lost any money and they don't claim they have. Their theory of injury is if we don't go to board meetings then we don't get our expenses covered. I don't think that's real benefit, and I'll get to that in a moment, but they've been going to meetings, they've been getting their benefits. It's not like Adam Quayton Powell, who never got his salary. They've gotten all of their expenses up to the point they left the board, so there's nothing left from their original claim to be resolved. But was there—I assume, though, there was a time period between when the board was dissolved, there were meetings that they wanted to go to after the— The board's never been dissolved. The defendants have agreed— All right. I'm being imprecise, but you get what I'm saying. These individuals did want to continue to be on the board— They wanted to be— —the result of which there would have been more per diem. That's all I'm asking. At the time they came into the case, they wanted to come on the board, stay on the board, and we can get to whether or not they had a real interest in that, but they left the board. There, the city county, either they resigned or the mayor replaced them. I don't know what happened, but they admit they're all gone, so they're no longer saying, we have a right to be on the board and go to meetings and get paid. They've given that up. I think it's moot, regardless of whether they're standing, but there is not standing. The only— What this court said in Stallworth is the first time we were up here, the plaintiffs failed to demonstrate an injury to a legally protected interest. The legally protected interest, they asserted, belonged to the city of Jackson. The citizens of Jackson were being discriminated against and not being allowed to run their own airport. This court said in Stallworth, that is not an interest protected by federal law into 1983. The interest didn't exist. They went back and amended. They amended and alleged a new injury, and that's their expense argument, but they haven't alleged a new interest. They haven't said what interest has been impacted by the fact that they might someday not get their expenses. As I said, Congressman Powell was entitled to his salary from the day he should have taken office. They didn't pay it to him. That was a pocketbook injury he was entitled to pursue. Expenses are not that way at all. Expenses reimburse you for the cost of public service. Expenses are there so these commissioners don't have to pay for the benefit of working for free, but if they don't go to work— Isn't salary also— No salary. —compensation for not working for free? You're being paid for your time. There is no salary. The per diem is, like most per diems, is an estimate of expenses for coming to the job. I think the federal government hands out those per diems, too. May I ask just two quick questions? If, hypothetically, Congress were to abolish judicial salaries, would judges have standing? I realize that's not this case. I'm asking hypothetical. If it was a salary repeal, would there be standing? You know, I thought Judge Will had litigated that years ago. He said his salary was being abolished piecemeal by not giving him inflation. I suppose they'd be— Well, you should be aware of U.S. v. Hatter, the Supreme Court case not too long ago. It's fine if you're not. Yeah. I mean, you've got to get to the and I don't know the answer to that question. Well, Mr. Wallace, I mean, the Constitution gives us a right—individual judges over here, sorry. Yeah, I know we need to get our acoustics worked on. The Constitution, I believe, gives us, federal judges, a right not to have our salaries diminished while we're in office, which led to litigation. Maybe a more hypothetical closer to this case would be what if Congress exercised its constitutional authority to which it could do. And I know some people might want it to, but the Congress can do that. Congress can abolish inferior courts. It doesn't have to create them. And if Congress abolished all the federal courts, you know, would judges have the authority, I guess, to seek an injunction to remain in office, you know, based on our interest in the per diems that we used to eat at Galatoire's? You know, I think you would have—whether the court exists or not, they have to keep paying you. That's the easy answer. That's true. But the question is, if you don't have to come to work anymore, can you—do you have a right to be paid for not eating at Galatoire's? That's right. And I—which is where I'm heading at noon. I mean, as sad as that would make me, I would have to say no to that. But— I think that's the case. The point of the per diem is to—is not your salary. It reimburses you for expenses. If you don't have any expenses, you don't have any reimbursement. And the net result is there is no pocketbook injury. These folks have not been injured or will not be injured or their successors will not be injured if the law tells them they don't go to board meetings anymore because they never got paid to go into the per diems, merely cover the costs of their service. They've never wedged its income. I don't see how there's a pocketbook injury. If instead of Congress abolishing the court or getting rid of all salaries, instead it's $100 reduction in the annual salary, standing? I mean, it's unconstitutional for the same reason. I do think— Hold on. If I may interrupt—I apologize for They are distinct— You could have standing on a frivolous merits claim. And you can have a wonderful merits claim with no standing. Fair enough. So, you know, I would think that an individual judge would have individual standing. Yes, it is a law that applies to the entire judiciary, but the entire judiciary doesn't even have the ability to act as a group like the legislature does or like a board does. So, I would think the injury is to you. Your interest isn't getting paid. I think you probably got standing in it. Just because we were talking about it, I want to make sure you're saying the $100 salary reduction, there would be standing. Any salary reduction, I think, would be standing. You're just saying there is— Any per diem reduction, because you don't go to court, no standing. Yeah, you're saying this is not a salary, this per diem. It's saying, like, what if we were all supposed to just do Zoom the rest of our life and not come to the court? Then we would not need a per diem for travel to New Orleans. And you're saying that would not give us standing. You've had no pocketbook injury. At least you're miles away from Congressman Powell, which is who they're relying on. But some people get per diems for their—senior home, or used to could, at least. How would that play out? If you don't have to travel, you haven't got— Well, to get on your Zoom in your office. If you're on Zoom, you've got no expenses. I don't see how— But you do, because you've got to go to your computer at your office. I guess you're getting a statutory interpretation if you're in your office. Because some people don't have a good internet at home or something, or they don't want to be bothered by their loud dogs or something. You know, I don't know what the Mississippi statute would say, but it seems to me if these commissioners sat home and phoned into a meeting, they hadn't incurred any expenses and probably shouldn't get a per diem. Now, what the attorney general would say about that, I don't know. Okay, what about they've also alleged losses of status and authority, and maybe some what we would call stigmatic injuries as well, because they believe they were— this was because of their race? I think you've accurately analyzed that, Your Honor. It is a stigmatic injury. They have put one paragraph about that in their brief, and they haven't put anything, any case, that supports the idea that in an equal protection claim, stigmatic injury is something that they can assert. In Moore v. Bryant, there was stigmatic injury all over that equal protection claim, and the court explained why it didn't work. And I think that would be the answer to the status argument is in an equal protection case, stigmatic injury is just not recognizable. You have to show differential government treatment, and I don't think they can show that. Yeah, Mr. Wallace, Kyle—sorry, Duncan over here. I take that's a fair point you make about stigmatic injury, and I'd have to go back and look at the complaint about whether they use that phrase. But my understanding of where the status and authority piece of it came from was, quite frankly, from Judge Higginbotham's concurrence in the Stallworth case where he at least that this position of status and authority may be a sufficient injury. I thought that that's where that came from. That's where they got it, and Judge Higginbotham didn't cite any authority either. He might be right, but we haven't got any authority before us that says status is enough, and I think considering it to be a stigmatic injury, they lose under Moore v. Bryant. Is that consistent with the First Circuit's Barton decision? I thought First Circuit did say status was enough. I think status was enough under Barton because it was a First Amendment case, not an equal protection case. It was a retaliation case, and if you retaliate against somebody, you have violated the First Amendment, and you know, at that point, a stigmatic injury may well be enough. So your standing argument does depend on distinguishing First Amendment from equal protection claims? It absolutely does, and I think that's what the good for some things. I think mostly First Amendment. It's not good here. Can I go back to your stigmatic race discussion? I thought the premise of the numerous university admissions cases is that you don't have to prove you would have gotten in. The very fact that you were treated differently because of race is enough to get you at least injunctive relief, assuming it was lawful. And that's the theory of Turner v. Foosh, which is what they rely on for their successors. Turner v. Foosh says you're entitled to an equal competition without disregard for race, and if you don't get it, then you've got standing. But there's no equal competition here. We're talking about people who already have jobs, and if you're looking at 2162— Well, students can go to another school. Excuse me? Students could go to another university. I'm not sure I understand that basis for distinction. Well, again, Turner says if you're competing for a job, and the university case says if you're competing for a position in school, you're entitled to argue that it should be free from racial discrimination. These folks aren't competing for anything, or at least they weren't. They've got the job. And while Turner says you have a right to be considered without disqualifying racial characteristics, there's nothing in SB 2162 that imposes a racial test. SB 2162 says that every position created by the new bill is open to all races. So you're not in a school desegregation case where you're looking at whether or not people have an unfair opportunity. The statute is completely even-handed, and so there's nothing—the Turner argument and the university integration arguments, I don't think, would apply here. Mr. Wallace? Go ahead, sir. Just factually, can you help me with something? It's me. I'm sorry. The microphones, I can't tell where the— Thank you, Mr. Wallace. I know it's hard. But I have a question about facts and when it became moot. So is Lieutenant Colonel Wright, he's gone now? Is that the situation? Lieutenant Wright is gone, and when did he leave? And Robert Martin, when did the new people leave? I don't know the dates, Your Honor. Their brief admits on page 16 that none of the plaintiffs are currently on the board. Now— But were they pushed off, or does it matter, or— I don't think it matters. I mean, the injunction is against the governor and his colleagues not to replace them. Well, they've been replaced. That injunction's about as moot as it can possibly be. So whenever it happened, they're gone. The new commissioners are not yet in. If you were mandated— They're not yet in because there are some— They're not in the case. They're not in the case is what you mean, yes. They are not parties to this case, which is why Coliseum Square doesn't apply. The parties to this case have no prospect of this ever happening to them again. So— Does it matter about the races of the people that replaced them or any of that sort of thing in this type of claim? Only as an illustration that the old statute and the new statute are equally non-discriminatory on the basis of race. Under the old statute, all races are eligible. They have put a white member on the board. Under the new statute, the white member and the black members will be treated exactly alike. The old authority will go away. The new authority will come in, and the existing board members may or may not stay depending upon decisions that have not yet been made by the appointing authorities. So I don't think there's any discrimination. I don't think any discrimination can be shown. Mr. Wallace, Duncan over here. I have a question back to Judge Ho's question about competition type injuries. I understood that at some point in this case, the plaintiffs were arguing that the city of Jackson and its voters had been treated—had been discriminated against because they're not—the state law is not treating their airport authority equally with other airport authorities. And I thought that that was an argument made, but that the Stallworth panel rejected that. Okay. Yeah. I mean, I think every argument in this case is the city of Jackson has been discriminated against. I don't think there's a word in the complaint that alleges that any of these commissioners have been discriminated against. But thanks to Judge Higginbotham's concurrence, they quite reasonably went back and said, well, you're still discriminated against the city of Jackson, but we've been hurt. Right. And that's not enough. You have to have an interest as well as an injury. And here, there's neither an interest nor an injury because per diem is not really a pocketbook injury. Are you saying per diem could be a pocketbook injury if there actually were meetings? Are you saying under no circumstances? Because there are other cases where per diems are considered to be the injury. I'm not sure they've cited any of them, so I don't know. But, Your Honor, I don't think a per diem—I mean, they don't allege they've lost any income. Their pocketbook is completely unaffected. If they don't go to a meeting, they don't incur an expense, and they don't get a per diem to reimburse it. So I don't think that's a pocketbook injury, certainly not on the order of Congressman Powell's. Like in the Georgia Power case where they offered per diems to white employees but not to black employees. Ma'am, I'm sorry. I'm sorry. In the Georgia Power case where they offer per diems to white employees and not to black employees, the per diems— I mean, if you're talking about real employees, then anything that happens, whether it's income or whether it's status, if you discriminate between black employees and white employees, as I understand Title VII law, then you've got an injury. But these folks aren't employees. They're public officials, and they have not suffered a pocketbook injury just by not going to meetings. So the difference is if they're employees or not? The judge— Is that the difference, whether they're considered employees? What is the difference when per diem is considered for standing and when it's not? Employees might get you into a Title VII case, which this is not. This is a constitutional case. And the question, whether they are employees or officers or bananas, is whether they have federally protected interest in going to those meetings. But don't you apply the same Article III analysis to a Title VII case? You've got to have standing in a Title VII case. I think Congress—and now I'm getting way out of my depth in Title VII cases—but I think that Congress has some authority to define what an injury is. And if Congress says, if you are discriminating between two people, whether you call them employees or stigmatic injuries, money injuries, you know, fringe benefits, all of that may very well count. But Congress has not said any such thing here. These are state officers, and the injury is to JMAA, not to these— Well, I just want to understand, if the state officers were still working, and they were showing up at the office, and those of one race were getting per diems and those of the other were not, you would say that's an issue? Sounds like an issue to me, and sounds like standing to me to the people that aren't getting the per diems but are trying to have lunch. They've been going to meetings for eight years, and they've all been getting their per diems. Mr. Wallace, I just need to follow up with that. I just need to make that—I need to get some clarity on that. There is no allegation in this case. Never has been. Not now. That black members of the commission, of the airport commission in Jackson, don't get per diems, but white members in Tupelo or Starkville or Pontotoc or wherever they have an airport commission do. There's no such allegation in this case. The point says nothing about commissioners in other cities. They say Jackson's being treated differently from Tupelo and Biloxi, but they don't say commissioners in Tupelo are being treated differently from commissioners in Jackson. There's no such allegation. All I will say about the privilege is it's a good thing that they admit they don't want to reconsider La Union. We've already got some law, and we don't have any time left to talk about it. We thank the court. Good morning, Your Honors. Austin Anderson for the appellees. I'd like to begin by correcting for that mic. Yes, is that better, Your Honor? No. You're able to hear me now, Your Honor. Okay, so I need to begin by correcting a fundamental misunderstanding about this per diem. It is actually compensation for service to the board. You really need to be louder and move the microphone closer to you, up towards you. I'm sorry. It's just it's hard to hear you. Understood, Your Honor. I disagree. It's not the mic. You're going to have to just talk louder in the mic. Will do, Your Honor. Moving around is not going to help. You've got to project into the mic, and we can hear you. Understood, Your Honor. The per diem that the commission has received is governed by a state statute, Mississippi Code 661-3-13, which specifically says it is, quote, compensation for the service they provide to the board. It is in addition to their right to be reimbursed for reasonable expenses. We have this in our complaint, too. We say they're entitled to a per diem, and they're entitled to their expenses. Mr. Anderson, are you saying it's a salary? It is. Compensation is taxable income. Are you saying it's a salary? It's not a salary, but it is compensation they receive. I don't see how you could say it's a salary. In the other parts of that very section, the law treats of salaries, and it does not call this a salary. Instead, it calls this a per diem compensation and sets the amount at $40 a day for when there is service on the board. $40 a day. Correct, Your Honor, but the important distinction in that and getting reimbursed for your expenses is it's not money that is being spent in furtherance of your official duties. It's money you get as compensation for performing the service. It's just like a wage. The money belongs to you. You can spend it on whatever you want. You don't have to spend it on lunch when you're traveling for official business. We're not talking about pencils to do your work. Correct. We're talking about food that you will eat. Correct. They receive the money. It goes into their personal bank account. They can spend it on whatever they want. It doesn't have to be related. It's money you would have spent out of your pocket if you were not on the board and, therefore, buying your own lunch. It's a free lunch. It's not intended to pay for your lunch while you're providing service. You get those expenses reimbursed, too. They save their receipts, and they put that in. So, if they travel to a meeting and they have to buy— I'm agreeing with you. If there's a board meeting via Zoom, so they're sitting in their home office or wherever they normally work from, they get the per diem for attending the Zoom board meeting, I take it. Correct. They get the per diem— It's not a travel expense. It's not a meal reimbursement. If you attend a board meeting, it will compensate you X. Correct. It's compensation. And for that reason, it's taxable. They get a 1099 at the end of the year. You don't get taxed on reimbursement for the expenses you incur in your official position. But this is different. This is just like a wage. And also like a wage, you only receive it as long as you're in your position. But that doesn't mean it belongs to your seat instead of belonging to you. When the board is abolished and you no longer have any service on the board, is there any occasion where you would need the $40, where you would get the $40? There's no longer any board. There's no longer any service. So, Your Honor, I want to take issue with your phrasing of need the $40. You get the $40 in exchange for providing service, just like you get a wage for showing up to your job. Suppose you're in the hospital and you don't attend a meeting at all. Would you get per diem then? No, you only get the per diem for the actual service you provide to the board. Again, it's your money. It's like unpaid leave. If I don't show up for work and I get unpaid leave, I don't get my salary either. Right. They aren't entitled to unpaid. Are they required to meet at all? I'm sorry? Are there any requirements that the board actually meets? I mean, the board is running the airport. It has to meet periodically in order to hire a CEO. Is there any statutory requirement you must meet annually, quarterly? I don't believe that's governed by statute, Your Honor. No, but they have a lot of responsibilities running this airport. They need to meet a lot, and they are compensated for doing so. I'm not sure I understand the current situation. The old statute's in effect. Correct, Your Honor. If your plaintiffs were successful or unsuccessful, there would be a new board that comes into it, and the existing board members would be out of a job. Would be out of a job, exactly. The bill we're challenging specifically says that the first thing it does is abolish the existing authority and then replaces it with a new authority, different number of members, different qualifications, answers to a different appointing authority. Is the contention that at this point in time, if the statute were to go in effect, it would still have a racial, it would be race-based, the abolition of the existing board? Yes, Your Honor. So the current commissioners, the ones who have replaced the plaintiffs who issued these subpoenas, who we admit have left the board in the three and a half years since they issued those subpoenas because their terms ran out, the current commissioners also have a claim, and it's the same claim as the commissioners in 2016. But are the current commissioners in this lawsuit? Did you, second amended complaint added new, these other people that I just asked questions about those people that came in in the second. Is there a third amended complaint with the new people? Not yet, no, Your Honor, because the case was on appeal when the turnover happened. So the Commissioner Wright, I believe, was the last named plaintiff to leave the board. His term expired, it was over a year after the panel had taken this. Why isn't it moot, then, if there's no commissioner currently eligible for the per diem that's in the lawsuit? We concede that the claims of the people who issued these subpoenas are moot. So the order before this court right now cannot be enforced because the people who issued those subpoenas no longer have a claim. But the current commissioners have the same exact claim, and if this case is decided on mootness grounds, as Mr. Wallace was telling you, we're going to be back here in six months. But they're not urging these claims today, are they? I was on the panel, but nonetheless, I'm concerned that they're not urging the claims. So this court would have to overlook the mootness problem, and it has discretion to do so under the . . . Could you have a motion to substitute in the new . . . I mean, we substitute in all the time, new attorney generals, new whatever, state officials as they're replaced. The problem is, Your Honor, that my clients are in their individual capacity, and they issued the subpoenas in their individual capacity. So merely substituting them would not fix the problem. They would have to reissue the subpoenas. We'd have to get a new order from the district court enforcing those different subpoenas. Practically speaking, they're going to be identical subpoenas. The district court's going to issue the same order. We're going to be back here in six months with exactly the same dispute. Because this case is going to recur, this court has discretion to overlook this mootness issue and instead reach the merits. Well, maybe they'll agree on the subpoenas, and they've tailored them now, and they understand that it has to be, assuming arguendo, that we were to say that it's okay to have a privilege log. The judge would look at the privilege log, and then there wouldn't be an issue. We don't know what . . . There are too many other variables, aren't there? So, Your Honor, all I can do is represent that we intend to do exactly the same thing we did after the 2019 decision. This has already happened. Have the new commissioners asked the district court to reissue the subpoenas? So, we would need a new . . . That wouldn't fix this appeal. We would need a new appeal. It would be substantively identical to this appeal, but it would have to be a new appeal because it would be a new order. So, the answer to my question is no. They have not asked the district court judge to issue the same subpoenas? No. We haven't substituted plaintiffs yet because the case has been here. Well, even though you're the lawyer, they would be the clients, and the clients' opinions do matter. Maybe I just haven't been a lawyer in a while, and things have changed, but I had to consult with clients before I would run around trying to get stuff from people that didn't want to give it. Is that not appropriate, what I did as a lawyer? Consult with the client? No, I absolutely agree. So, doesn't it matter who the client is? It does matter. Again, all I can do is represent that I have been in discussion with the current commissioners. They are on board with the lawsuit. They intend to step into the shoes of their predecessors and issue the same subpoenas. So, we'll be back here after seven, eight years. I forget how many years. We'll just be back up here when you substitute the new commissioners for the old commissioners. It would be the same decision. Same thing. We can just do this all over again. Right. Why would you suggest that the court judge . . . Let me ask you this, because you mentioned that the individual commissioners, they're issuing the subpoenas in their individual capacity. That's what you said? Yes. And Mississippi law allows an individual commissioner of an airport commission to issue a subpoena in his or her individual capacity? It's not Mississippi law. They are plaintiffs in the lawsuit in their individual capacity. All right. Okay. So, you bring me up to another point, which is the equal protection claim that's only in their individual capacities? Correct. Okay. Let me ask you this. When Stallworth came around, and Judge Higginbotham wrote his concurrence and suggested that standing could be based on their position of status and authority, and you amended your complaint, are you still relying on the status and authority of the commissioners for their individual standing? That is one of the injuries they suffer. So, yes. So, yes. Yes. So, an individual commissioner in his or her individual capacity has an individual interest, personal interest, in the status of the office. What case says that? It's not in the status of the office. It is the status that they enjoy by virtue of holding the office. And the Fourth Circuit, in the Dixon case, says a right and benefit that you receive by virtue of holding your office is yours personally, and you have standing to challenge it. Again, this is not a stigmatic injury. So, no stigmatic injury? You're just saying the office confers on me a status and authority that I have an individual personal interest in? The office confers individual and personal benefits on you, including, most simply, your compensation, but also the training and experience you get by virtue of able to attend these conferences. You're learning things and networking in ways that are going to benefit you as an individual after you leave office. It's a personal benefit. The status you enjoy in your community is the same. You have a hand in administrating the largest airport in the state. That is something that you, as an individual, when you go out into the community, even after your service, that's something you have to hold on to. You know, normally, in an equal protection claim, standing is based on the differential treatment. That is the basis for standing. That is the injury in standing. Are you alleging differential treatment in, let's start with per diems, in per diems, as between the Jackson Airport Authority and other airport authorities in Mississippi? Yes. How so? Because the other airport authorities, the members of the other airport authorities get to keep their jobs, Jackson loses. So, the answer, no. Are you alleging differential treatment in per diems, as in the Georgia Power case, where black employees did not get per diems, but white employees did? Are you alleging differential treatment with respect to per diems as compared from Jackson to other airport authorities? After the bill goes into effect, yes, because Jackson will no longer receive it. It's the same, it's the differential treatment is that the state is abolishing the authority on the basis of race. If I'm an airport commissioner in, what's another city that has an airport commission? Tupelo has it. Tupelo does. That was a good guess. Tupelo has an airport commission. Does the Tupelo Airport Commissioner right now get a per diem? Yes. The Jackson Airport Commission is still functioning right now because it hasn't been abolished. Do the Jackson Airport Commissioners get a per diem? Yes, until the bill goes into effect. So, the answer is yes. So, there is no differential treatment being alleged. We're not alleging that the differential treatment has already happened. We're alleging that it's imminent. We're seeking perspective relief here. We want the bill to... Under the new airport authority, when there are new seats, will those people get per diems? Yes, but those people will not be the people who currently hold these positions. And we have alleged the purpose behind replacing the... How do we know that it won't be the same? Because there are five spots on the current commission, the city council... I know who the different people appoint them, but I have seen different presidents nominate the same person to the judgeship. So, it is possible for two different people to nominate the same person, isn't it? It is theoretically possible. So, we don't know that. We would have to speculate. It's entirely speculative that these people would get... But it's also speculative they wouldn't, right? All we know for sure is that they will lose their jobs as soon as this bill goes into effect. That's the harm we're trying to prevent. Okay. Can I ask you on the per diem you were saying it's not compensatory for like travel, it's not paying for travel and that kind of thing. If I was on this commission and I was preparing for a meeting in my house, and I was sitting on my bed preparing for the meeting, would I get the $40 for that, that day? So, the statute says that you are entitled to the per diem for each day that you are engaged in official duties of the authority. I'm not general counsel to the authority. I don't want to parse that statute on their behalf. But the point is that you are compensated for providing service. You're not reimbursed for your expenses. It's just like a wage. So, you don't know, though, if I'm sitting on my bed preparing for next week's meeting, whether I get my $40 per diem for that day? I don't know how it would apply in that specific situation. I can see an argument for it, but I don't want to tread on the interpretation of that state statute. Let me ask you a hypothetical about, here we go in the middle, hypothetical about standing. Assume in Mississippi that there's a town that has a local library board appointed by the mayor and confirmed by city council. And a woman, let's call her Jane Doe, she's a local real estate agent. That's how she earns her living. And she's appointed to the local library board. The library board has one meeting a month at the town library. And at that meeting, they conduct the business of whatever needs to be decided about the library. And they receive a free lunch consisting of a sandwich and some iced tea and a cookie. Let's assume that Jane is on the board for several years and then the town, by ordinance, decides to abolish the library board and place all of the authority over the library in the hands of the mayor. Jane Doe is upset about that because she wants to stay on the library board. Does she have standing to sue to challenge the abolition of her position and the existence of the board? There are two separate questions there, I believe, Your Honor. The answer to the first one is yes, she has standing. Because Supreme Court and Turner against Fouch and other circuits and Barton and Highland have said volunteer government positions are also valuable. You can't lose them for an impermissible reason. But the second, whether or not she'd be able to sue depends on whether she has a cause of action. If she would have to plausibly allege that the reason the library board was abolished was because it was majority women and the city government didn't want women running the library anymore. That's what we're alleging here. The state knew that the black mayor and black city council of Jackson were going to continue appointing black people to run the airport. The complaint says they took the airport away from Jackson and gave it to a new regional authority because they didn't want black people running the airport. So the black commissioners who are currently running the airport have standing to challenge that law. So what do you need the per diem for then? You just said that the library, volunteer library has standing merely because she's a volunteer official. So you don't need per diem. Why are we talking about per diems? Correct. We don't need the per diem. It makes this easier because we have it. But the other valuable benefits they get from being in the position also constitute an injury. Any volunteer official on any board anywhere, if you abolish the board and you say a lawsuit says it's impermissible motive, all of them have standing. Library boards, local, anything. If they can plausibly allege that the action was unconstitutional or otherwise illegal. That's what section 1983 is for. Situations like this where the state officials have allegedly taken an action in violation of the federal constitution. That's the cause of it. The legislature still needs standing. You need standing. Right. And you're standing, you're injured by the loss of your position. That's established by Turner. It's established by Barton and Highland. It's you have a concrete injury. It's personal to you. That's your standing. What is personal to them that the legislature abolishes the entire board? If an individual commissioner were thrown off, I suppose I could see that. But I do not understand why a legislature can't say we need to reorganize government in a certain way. And then no individual is affected by that. Well, the problem is the individuals would be affected by that. Well, you don't know that, do you? But until the new board comes on, do you? I mean, the legislature might appoint two thirds black commissioners to the new authority, right? Or whoever appoints you. They would have to lose their positions first in order for the new regime to take place. Well, all we know is for sure. The law would do that. And then the new regime comes in with a new method of appointment, right? Right. You can't hypothesize that it's discriminatory until something more happens, can you? Your Honor, I believe we're getting into a merits problem. Well, no. I think you're getting into who has the right to complain. The injury you're complaining about is allegedly that the city of Jackson is losing a governmental function. The fact that these people serve on that board the way it works now doesn't mean that they are de facto the city of Jackson. And they're suing purely in their individual capacities. Right. I must be terribly wrong, but I just. I don't think so, Your Honor. I think we might be talking past each other a little bit. The individual commissioners also have a claim. The city was a plaintiff below. There were other allegations in the complaint. And that's not before us, right? Right. That's not where we're relying. Only the individuals. Right. We are only relying on the individuals. The individuals are personally harmed by losing their positions. That's what Turner says. That's what. Well, if that were so, then government can never reorganize because somebody can always say it's being done for an impermissible purpose. And the government should not be able to reorganize for an impermissible purpose. You need both. What about all these presidential commissions? There are hundreds of presidential commissions, are there not? And if the president abolished one because all of its members were black, there should be a claim there. That's what that's all we're. I'm going to try this one more time. In an equal protection case, the injury is the differential treatment. There are cases from here to Jackson on that differential treatment. What is the differential treatment alleged here? They lose their positions where similarly situated plaintiffs don't. They're being treated differently because they're black. The black people don't get to be commissioners anymore. The white people in Tupelo get to continue to be commissioners. That's differential treatment. Counsel, can I ask you a question about mootness? I realize that we're going way back in the field, but I'm hung up on it. So you conceded earlier that the case is moot, but you said we have discretion to get past that jurisdictional obstacle and reach the merits. I have no idea what you meant by that. Can you explain it to me, please? That's the capable of repetition but evading review doctrine, which. So that's not obviously, that's not discretion to look past a jurisdictional obstacle. Capable of repetition yet evading review would mean that the case is not moot. I read the Supreme Court cases differently, Your Honor. Which case are you thinking of? I'm not sure I understand. And I guess I have a bigger problem with all of this, which is that let's just get past that and just agree to disagree. Capable of repetition yet evading review means capable of repetition as to the complaining party, that is the plaintiff. And I don't take it that any of your claims have anything to do with the original plaintiffs. You're saying it's capable of repetition by a different plaintiff. Am I misunderstanding the contention? No, that's correct. It's a different plaintiff who is in the same position. It's the same claim. We acknowledge it doesn't fit exactly within the contours of how that doctrine has been described. But the premise that the court can overlook a mootness problem if it makes sense to do so in the case is valid. And this is a perfect case to do so. But why would it evade review? Why is this the perfect case? This is not like something that's going to happen really fast and has to be litigated all the way up. As we've seen, this is not really fast. So I don't understand why it would evade review. We could have this same meeting about standing in three years if you got your complaint and they filed subpoenas and the court ruled, I mean, how would it evade review with the new people? Your Honor, may I answer Judge Allred's question? The problem is that we don't know that the next appeal is going to settle it either. It's been three and a half years since they issued these subpoenas. There's been turnover in the normal course. The same thing might happen next time. If the court has discretion to overlook a mootness problem and get to the heart of the issue, which we think it should, this is a case in which that makes sense. Yes, sir. Can I ask one question? Could you speak for just a minute about whether or not we have appellate jurisdiction? Yes, Your Honor. So we stand by the arguments in the brief. There's no appellate jurisdiction here. Here's how you know that. If this court agrees with the panel and every other court that's actually reached the merits and says the legislators have to provide a privilege log, we go back to the district court, which looks at the log, makes a call about whether documents are privileged. If the court says you have to produce these specific documents because they're not in the scope or because there's been a waiver, the legislators get to appeal that decision under Carr and Cates. And so we're back in the Fifth Circuit with a more specific framing of the exact same discovery dispute. That is exactly what this court was talking about in Banco Pueo when it said preliminary discovery determinations are not appealable. We're going to have interminable delays to litigation like has happened here simply by virtue of interlocutory appeals. I know this case has been going on forever, but we got an order enforcing these subpoenas back in 2017. It's the other side that's been appealing this whole time. We want to get to the merits. We want to be able to prove our claim. But why would that be so here where, as Mr. Wallace told us, that the trial judge recognized that his order did order immediate relief. It was not just a privilege log. It was immediate relief that certain documents had to be produced. And doesn't the jurisdiction for appeal come from that order, not the order to produce the log, but to immediately say that documents produced to third parties were not privileged? Respectfully, Your Honor, we read the order differently. I know the magistrate said that communications with third parties would likely have to reproduce, but we're looking at the district court's order. And the district court's order clearly lays out a two-step process. First, you get a privilege log. Then the court decides whether the privilege applies to the documents. The court subsequently said that that's the way you read the order? No, Your Honor. The magistrate judge said. It was the magistrate judge, but also that's not what the magistrate judge said. We filed a reply to the 28-J notice. There's competing arguments about this in the record. That's not what the magistrate judge said. He actually acknowledged that all he required was a privilege log. Are there no further questions? Thank you, Your Honor. Counsel, does the United States... Over here. Does the United States agree with Mr. Wallace and Mr. Anderson that the case is moot? Your Honor, we are not taking a position on that issue in this case. And I'm only able to speak today about the important question of whether or not the district court judge properly exercised his discretion   and consistent jurisdiction. And I'm not sure that the district court in the handling of discovery matters and is consistent with the federal rules and federal practice in this realm and certainly may reveal documents that are not protected by the state legislative privilege and relevant to the central question in this case of legislative purpose. Does the U.S. have a position on standing? No, we do not, Your Honor. But would you agree that both mootness and standing are predicate to the argument you're about to make? And yes, Your Honor. And what I hope to share with you today is only what we are asking the court to address if it does reach the merits issue here of the propriety of the privilege law, which we think is fairly unquestionable under the precedent of this circuit. So just this last year in Lupe, this court held that the state legislative privilege is bounded, waivable, and may yield. And in reaching that holding, the court observed that records that may not be protected from production just because they are within the privilege code. So the court there had before it a privilege law, which it considered in analyzing whether withheld documents must be produced. And the same approach certainly would be appropriate in this case. And we don't think the legislators have identified any binding authority that favors their radical position that they should be excused categorically from participating in relevant discovery that may implicate their motives. So I wanna talk just briefly about the norms of federal practice, which we think here clearly support the district court's order and use of its discretion. Rule 45 requires any party resisting a subpoena on privilege grounds to describe the nature of the withheld documents in a manner that enables the parties to assess the claim. The courts of appeals, including this court, have required typically a privilege law or a document index, some vehicle that enables the assessment of the privilege. And what the law gives you is sort of the who, what, and the when of the withheld documents and allows the court to assess whether what's been withheld, in fact, falls within the bounded scope, may be waived, may be subject to selective disclosure, other factors that might bear on whether or not the documents need to be produced to serve the normally predominant principle of using all rational means to ascertain the truth. Certainly, subpoenas to state legislators have no exception from this rule. How many cases can you cite to us where these kinds of internal communications have been used to prove or disprove a claim? It seems to me that even during the biggest debates over First Amendment and equal protection litigation in the past that involved legislative motive, the court, particularly the Supreme Court, was able to found their decisions solely on things that were in the public record. Well, Your Honor, I don't know that I can give you a number of cases in which this kind of evidence- Can you give me any? Yes, Your Honor, I think I can. Some of the cases that are cited in our brief, including this court's decision in Beezy, which references information provided through depositions- That was never litigated. Well, the en banc court, that was never litigated. My reading of the en banc court's decision there certainly was that that evidence could, on remand, be used to- I understand that, but I know that case very well. Yes, Your Honor, yes, Your Honor. There are other examples, though. We cited the McCrory case from the Fourth Circuit where requests made from legislators and their staff to obtain information about the racial impact of certain challenge voting practices, that ultimately was part of the court's assessment of discriminatory purpose. We cited other examples in our brief. I think Busby v. Smith talks about deposition testimony in which the private racism of one of a redistricting effort's proponents was significant to the pre-judge court's ultimate decision that there was a discriminatory purpose. Certainly not that that was the only factor, but that that was part of the picture that the court had to consider. So we have a few examples at pages 12 to 13. Very few, considering all the lawsuits that are made. Well, Your Honor, and I certainly do not want to suggest that those are all, that our brief cited the entire universe. But what I think is important, nevertheless, to keep in mind is that Arlington Heights creates a multi-factored inquiry in equal protection claims that includes, as very relevant evidence of legislative purpose, the contemporary statements of decision makers. So we know that that is important information according to the Supreme Court. And Arlington Heights itself, even though it talks about legislators' testimony as an extraordinary instance and that the testimony may be barred, in some instances, by privilege, nevertheless, that case itself incorporated evidence taken from local decision makers, the local board members, developed both in discovery and at trial. Counsel, can I ask you a post-Arlington Heights case? I'm confused by this. Bogan v. Scott Harris says that legislators have an absolute legislative immunity for the things that they do in their legislative capacity. So if you bring the 1983 claim, as there was at issue in Bogan, if you bring a 1983 claim against the legislators and make them parties, they're absolutely immune. Obviously, that's far more than qualified immunity. You get nothing. Why is it that if they're non-parties and you issue third-party subpoenas against them, they get less than they would if they were actually sued? Well, Your Honor, I think that, so Bogan ultimately is interpreting Tenney, and Tenney is concerned with the burden state legislators and local legislators might face if they have to defend themselves in a lawsuit. We are not talking about defending oneself in a lawsuit here. We are talking about a privilege that the Supreme Court has said has lesser footing than the federal protections under the Speech or Debate Clause, and that the notion of burden, I don't think the Supreme Court has ever said that that alone is a basis for excusing parties from legitimate discovery that goes to the central issue in a claim that Congress permitted. Well, there are cases that address that. They say it's unlikely that individual legislators' views can be attributed to the legislature as a whole, so why put them to the burden of going through the discovery? So, and Your Honor, I do see that I'm out of time, but I hope it's okay if I respond to your question. So it is the case that some courts have said that individual legislator statements might not be as probative as other kinds of evidence, but I think we have to go back to the precedent in Arlington Heights, which says that contemporary statements are especially relevant in determining what the legislature was seeking to do, and it cannot be that a common law privilege doctrine eliminates a core piece of the evidentiary package that the Supreme Court acknowledged in Arlington Heights and that the Supreme Court has continued to rely on, and this court and other courts of appeals in the years following. Your Honors, if you don't have any other questions, we ask that you affirm the district privilege law order. Thank you. Please, Court, I'm sorry I was too eager to get up here, but I was so happy to hear Mr. Anderson finally say what his claim of differential treatment is. He says his claim of differential treatment is that the commissioners, whoever they happen to be right now, will lose their positions where white commissioners in Tupelo won't. I assure you there is nothing in the complaint about commissioners in Tupelo. There is certainly nothing in the complaint about the race of the commissioners in Tupelo, and now that you know that we have an integrated board, the relevant factor is the white members of the board will be treated exactly like the black members of the board under SB 2162. There is no differential treatment. What if somebody wanted claims, but not someone on the board, someone claims that the legislator's intent in abolishing a particular board, enacting a piece of legislation, was totally racially motivated? Who would have standing to bring that claim? That is their claim here. Right. Who would have saying, you know, they don't want, the reason behind this, they targeted Jackson because solely out of racial motivation. But that was the claim in Moore v. Bryant that we fly the confederate battle flag because we're racists, and that was the claim. The state's doing something because they're racist, and nobody had standing to bring it because there was no differential racial treatment. Now, it depends on the board. It depends on what else is going on. But before you can hear a complaint that a state is motivated by racism, you have to find differential racial treatment. And this mythical comparison to commissioners in Tupelo is not in the complaint, and I don't think would do them any good. And Mr. Wallace, even if it was, it's already been rejected by the Stallworth case that said that Jackson has been singled out, does not establish that a legally protected interest of the individual plaintiffs has been violated. So differential treatment, Jackson v. other cities is already out of this case. I think that's the answer to that question, Your Honor. I don't think any of the other cities have anything to do with it. The statute treats white and black members of this board exactly alike. There is no differential treatment. But I will say they don't lose their jobs. I was delighted to hear his answer to Judge Haynes' question that it's speculative whether anybody will ever lose a job. I've been arguing that since the first day I got in. And their answer to that is, well, maybe they'll get another job later on, but this job is gonna disappear. No, it's not. SB 2162 says that every obligation of the Jackson Municipal Airport Authority will be continued and become an obligation of the Jackson Metropolitan Area Airport Authority. Whatever the old authority owes to these commissioners when the clock strikes midnight, the new authority will owe them when the sun comes up in the morning. They are not gonna lose their jobs. There's a statute. So what was the reason? This is Judge Haynes again. What is the reason for this new legislation? I don't know the answer to that. There is obviously some belief that a metropolitan area will better serve its market than one run by Jackson. Jackson used to dominate the metropolitan area. That is no longer the case. Most users of the airport are people who live outside. So it's to spread it out a little more? Is that the idea? Madison County, Rankin County, they all use the airport. And the idea is they ought to have representation on the airport board. That is not like the airport where everybody's in Harrison County, not like Tupelo where everybody's in Lee County. We have a broader service. Now, is that their real reason? I don't have any idea. Because the other side's position is that it's because they wanted to get rid of all the black commissioners because they had taken an action to appoint a director of the airport who was black that people didn't like and that this was a personally motivated racial thing. Is that right? Is that in the complaint? That's what, I don't think it's in the complaint. But that's- They have said it in their briefs. They have said it in their briefs that, well, you were picking on Evelyn Reed, particularly because you didn't like what she did and her colleagues didn't like what she did. I don't think it's in the complaint. And once again, what the complaint really says is that the citizens of Jackson, all of them are being discriminated against. Stallworth already says there's no such interest to protect. So these commissioners don't have an individual interest. They don't have a cognizable injury. They're not going to lose their jobs. And until this law goes into effect and the defendants start appointing people, they're not going to go anywhere. We think this is a non-dispute. This is not a case in controversy under the Constitution. It's a political dispute that has been going on much too long now. And I hope you will rule on that basis and not make us have to come back here with two commissioners three or four more years from now. Yes. Thank you. The court will stand adjourned until nine o'clock in the morning.